# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | |
|---|---|
| CATOOSA COUNTY REPUBLICAN PARTY, and JOANNA HILDRETH, <br><br> Plaintiffs, <br><br> v. <br><br> CATOOSA COUNTY BOARD OF ELECTIONS AND VOTER REGISTRATION, *et al.*, <br><br> Defendants. | CIVIL ACTION FILE NO. 4:24-cv-00095-WMR |

## ORDER

Before the Court is the Defendants' Motion to Dismiss for Failure to State a Claim [Doc. 24]. Plaintiffs, Catoosa County Republican Party and Joanna Hildreth, brought this action contending that Defendants violated their First Amendment rights by including four candidates on the Republican Party ballot in the Georgia primary despite the Catoosa County Republican Party's opposition and by excluding requested ballot questions. After review, the Motion to Dismiss is **GRANTED**.

1

I.     **Background**

**A. The Candidates**

The four candidates that the Plaintiffs sought to remove from the Republican primary ballot were Larry C. Black, Steven M. Henry, Jeffrey K. Long, and Vanita Hullander (the "Candidates").[1] [Doc. 11 at 6]. On March 4, 2024, the Candidates attempted to qualify as Republican candidates for the May 2024 primary pursuant to O.C.G.A. § 21-2-153, but Plaintiff Catoosa County Republican Party refused to qualify them. [*Id.* at 7]. On March 5, the Candidates filed suit in the Superior Court of Catoosa County, seeking injunctive relief against the Catoosa County Republican Party. [Doc. 21-2 at 1]. The Candidates obtained a TRO from Judge Don Thompson in that case, ordering the Catoosa County Republican Party to qualify the Candidates for the primary. [*Id.*].

But, it did not comply with this order and instead filed an Emergency Motion to Lift the TRO. [Doc. 13-1]. After a hearing on March 7, Judge Thompson denied this motion and ordered Catoosa County Sheriff deputies to escort the Candidates to

---

[1] Black and Henry were qualified to appear as Republican candidates for the position of Chairman of the Catoosa County Board of Commissioners, Long was qualified to appear as a Republican candidate for the position of Commissioner for District 1, and Hullander was qualified to appear as a Republican candidate for Commissioner for District 3. [Doc. 11 at 6]. Each of these candidates had previously appeared and prevailed on a past Republican primary ballot. [*Id.*]. Black, Long, and Hullander were incumbents, and Henry is a past Chairman of the Board of Commissioners. [*Id.*].

2

the Catoosa County Republican Party to be qualified. [*Id.*]. The Plaintiffs still did not comply.

On March 8, Judge Thompson held a compliance hearing and ordered that the Candidates were "entitled to qualify" with Defendant Catoosa County Board of Elections pursuant to O.C.G.A. § 21-2-153(c)(2). [Doc. 13-2]. The Board of Elections did comply with the Judge's Order and qualified the Candidates on March 8. [Doc. 11 at 7–8]. The Plaintiffs appealed Judge Thompson's order that same day. [Doc. 21-3]. The appeal is currently pending before the Supreme Court of Georgia.[2]

The next week, the Plaintiffs filed written challenges for the Candidates' qualifications pursuant to O.C.G.A. § 21-2-6(b). [Doc. 11 at 10]. On April 2, the Catoosa County Board of Elections held a hearing on the challenges as required by O.C.G.A. § 21-2-6(c). [*Id.* at 10]. At the hearing, the Board voted 4-1 that the Candidates are qualified to seek and hold the local offices for which they are offering. [*Id.* at 11]. This decision was appealed to the Catoosa County Superior Court on April 11, and this appeal is pending. [Doc. 21-5].

## B. The Ballot Questions

After Judge Thompson's March 8 order, Plaintiff Hildreth as Chairman of the Catoosa County Republican Party submitted ballot questions for placement on the

---

[2] The appeal was originally filed in the Court of Appeals of Georgia, but was subsequently transferred to the Georgia Supreme Court. [Docs. 13-3, 13-4].

3

primary ballot. [Doc. 11 at 8, 46]. These questions were processed by the County, but the Georgia Secretary of State's Office sent an email to Hildreth explaining that the "Secretary of State cannot publish party questions on the ballot that contain the names of candidates or commentary regarding those candidates, as that constitutes unlawful electioneering." [Doc. 13-5]. The Secretary of State gave Plaintiff Hildreth the option of submitting new ballot questions by March 18, but Hildreth did not do so. The questions were as follows:

1. Do you think anti-Trump Democrats should be able to get a court order to force the elections board to qualify them as Republican candidates for office?

2. Did you know that Steven Henry, Vanita Hullander, Jeff Long, and Larry Black were not approved to run as Republicans by the Republican Party?

[Doc. 13 at 46].

### C. Procedural Background in this Court

The Plaintiffs filed the Complaint [Doc. 1] and a Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 2] in this Court on April 5, 2024, as well as an Amended Complaint [Doc. 11] on April 9. This Court held a hearing on the Plaintiff's Motion on April 17 and subsequently denied the Plaintiff's TRO, finding that an injunction would not serve the public interest given that absentee, overseas, and military ballots had already been sent and because the Plaintiffs failed

4

to show a substantial likelihood of success on the merits. [Doc. 22]. The Defendants now move to dismiss. [Doc. 24].

## II.   Legal Standard

Under the Federal Rules of Civil Procedure, a party may move to dismiss an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth . . . ." *Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Next, a court must "accept[ ] the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).

## III.  Discussion

The Complaint raises two causes of action pursuant to 42 U.S.C. § 1983. First, the Plaintiffs allege that the Defendants violated their First Amendment right of freedom of association by qualifying the candidates to appear on the Georgia primary. Second, the Plaintiffs allege that the Defendants violated the Plaintiffs' First Amendment right of freedom of speech by excluding their requested ballot questions. The Defendants move to dismiss both claims. The Court concludes that both claims should be dismissed.

### A. The Plaintiffs Lack Standing to Bring their Freedom of Association Claim.

"[A] federal court is powerless to act without jurisdiction," so a court "must satisfy itself[ ]of its own jurisdiction" wherever there are questions of standing. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974–75 (11th Cir. 2005) (asserting that this Court is "obliged to consider questions of standing regardless of whether the parties have raised them"). To establish standing:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1286 (11th Cir. 2021). "An injury is particularized when it affects the plaintiff in a personal and individual way." *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1113 (11th Cir. 2021) (internal quotation marks omitted). "An injury is concrete if it actually exists—that is, if it is real, and not abstract." *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1242 (11th Cir. 2022) (internal quotation marks omitted). The Plaintiffs argue that they were injured "in a personal and individual way" when the Defendants forced them to associate with the Candidates by qualifying them to appear on the Republican primary ballot. But, after review,

6

the Court concludes that the Plaintiffs cannot establish an injury that is particularized to the Plaintiffs.

Notably, the Plaintiffs themselves never qualified or endorsed the Candidates. Instead, due to their refusal to comply with the superior court's orders, the court bypassed the Plaintiffs by ordering the Defendants to qualify the Candidates.[3] So, the Plaintiffs must rely on the Candidates' mere presence on the ballot to trigger their associational rights.

As the Supreme Court has previously held, "the Republican Party has a First Amendment right to freedom of association and an attendant right to identify those who constitute the party based on political beliefs." *Duke v. Massey*, 87 F.3d 1226, 1234 (11th Cir. 1996) [hereinafter *Duke III*]; *see also Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989) ("Freedom of association means . . . that a political party has a right to identify the people who constitute the association, and to select a standard bearer who best represents the party's ideologies and preferences"). And, "a corollary of the right to associate is the right not to associate." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 445 (2008) ("a party's right

---

[3] Interestingly, counsel for the Plaintiffs conceded at oral argument that the Plaintiffs would have no claim regarding the placement of these candidates on the primary ballot if the State Republican Party, rather than the County Republican Party, was charged under the law with facilitating the qualification process.

to exclude is central to its freedom of association[ ]and is never more important than in the process of selecting its nominee"). But, a party's "right to associate for political purposes through the ballot" is not absolute; it does not have unfettered control of who can appear on the ballot and how. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *cf. Wash. State Grange*, 552 U.S. at 455–57 (upholding state law allowing candidates to identify their "self-designated party preference" on the ballot after a facial challenge).

For example, who represents the Republican Party on the general election ballot following a primary is not solely up to the party, but also relies on the decision of its voters. *Cf. Bullock v. Carter*, 405 U.S. 134, 145 (1972) (stating that the state has an interest in "assur[ing] that the winner is the choice of a majority, or at least a strong plurality, of those voting"); *Anderson v. Celebrezze*, 460 U.S. 780, 796 (1983) ("there can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election"). And, state election laws will affect which candidates appear on the ballot and "will invariably impose some burden" on the "right to associate with others for political ends." *Burdick*, 504 U.S. at 433 ("States retain the power to regulate their own elections."); *Cal. Democratic Party*, 530 U.S. at 572 (2000) ("States have a major role to play in structuring and monitoring the election process, including primaries").

To establish the injury, the Plaintiffs point to a trilogy of cases involving challenges by a presidential candidate, David Duke, to the Republican Party's presidential candidate selection committee's deletion of Duke's name from the list of potential Republican presidential candidates for the primary. *Duke III*, 87 F.3d at 1232. The Eleventh Circuit decided that Duke did "not have a right to associate with an 'unwilling partner,' the Republican Party." *Duke v. Cleland*, 954 F.2d 1526, 1530 [hereinafter *Duke I*]. Rather, Duke's First and Fourteenth Amendment interests in being placed on the ballot as the Republican Party's representative did not "trump the Republican Party's right to identify its membership based on political beliefs nor the state's interest in protecting the Republican Party's right to define itself." *Duke III* at 1232–33. But, importantly, there are at least two crucial differences between the *Duke* cases and this one.

First, the Plaintiff here is a county Republican Party rather than the state or national party. And, the Court is not convinced that candidates for office are associated with a county party based solely on their presence on a primary ballot. At most, it would seem that candidates on a primary ballot would be associated with a state or national party.[4] Second, *Duke* involved a presidential primary where the Republican Party enjoyed substantial discretionary power. In *Duke*, Georgia law

---

[4] Indeed, the Court is unaware of any indication or mention on the ballot of the Catoosa County Republican Party in any way.

9

provided that a selection committee comprised of Republican members was responsible for selecting who appears as Republican candidates on the presidential preference primary ballot. *Duke III*, 87 F.3d at 1229 (citing O.C.G.A. § 21-2-193(a)); *see also Duke v. Cleland*, 5 F.3d 1399, 1404 (11th Cir. 1993) [hereinafter *Duke II*] ("The Committee may exclude nationally recognized candidates for any reason or no reason at all"). In addition, the Court recognizes that the Republican Party enjoys even more discretion regarding presidential candidates through its delegates at the Republican National Convention.

Meanwhile, in this case, Georgia law provides no discretion for a county party to deny qualification to candidates based on substantive concerns. Instead, O.C.G.A. § 21-2-153 provides that "all candidates for party nomination in a state or county primary *shall* qualify as such candidates in accordance with the *procedural* rules of their party" provided that the candidates meet the other statutory requirements. (emphasis added). And, the Plaintiffs' reasons for not qualifying the Candidates were substantive—citing concerns on their tax policy—rather than procedural, as set

forth in the statute.[5] Ultimately, this Court concludes that a county political party's associational rights are not injured "in a personal and individual way" where the party does not qualify or endorse the candidates and particularly where state law provides no discretionary authority for the party to deny the candidates access to the ballot. *Cf. Duke II*, 5 F.3d at 1403–04 ("The parties themselves do not select their primary candidates or retain ultimate responsibility for choosing those it seeks for representation" because the Committee "power [wa]s such that it alone may declare who is fit to run, and who, by extension, is fit to govern" and its "determinations [we]re essentially unreviewable by the party membership").[6]

---

[5] The Plaintiffs state that they are only bringing an "as-applied challenge and are not seeking that any statute[ ]be declared unconstitutional in all cases . . . ." [Doc. 11 at 15]. But, given that the superior court's order was compelled under a textualist reading of O.C.G.A. § 21-2-153, the Plaintiffs are functionally challenging the constitutionality of the statute. Accordingly, the Plaintiffs should have noticed the state attorney general. So, the Court will certify to the Attorney General or the State of Georgia pursuant to 28 U.S.C. § 2403 that the statute has been questioned. Fed. R. Civ. Pro. 5.1. Even though this Court is dismissing the Complaint, the Attorney General may wish to intervene to assert the State of Georgia's interest on appeal or should the Court of Appeals remand this case for further proceedings.

[6] As the Presiding Judge herein served in the early 90s as the Chairman of the Gwinnett County Republican Party, the process of qualifying candidates is not new to the Court. Trying to limit who can run in a primary seems inconsistent with the purpose of a primary to start with. Perhaps the Catoosa Republican Party doesn't believe that the citizens of Catoosa County can for themselves intelligently decide which candidates best embody the principles of the Republican Party. The Court does not share such sentiment. It seems that our form of government is designed to allow citizens to pick their government leaders, not for insiders (of the local party) to pick the government leaders for them.

### B. The Plaintiffs' Free Speech Claim Must be Dismissed.

The Plaintiffs allege that the Defendants violated their First Amendment right to free speech by censoring their requested ballot questions. This Court must first determine whether the ballot questions are government speech because the First Amendment only "restricts government regulation of private speech; it does not regulate government speech." *Leake v. Drinkard*, 14 F.4th 1242, 1247–48 (11th Cir. 2021) ("When the government speaks, it may refuse to endorse or freely remove speech of which it disapproves."); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) ("the Government's own speech . . . is exempt from First Amendment scrutiny"). Although there is no precise test for government speech, courts have typically looked to three factors: "history, endorsement, and control." *Id.* The Court ultimately concludes that all three of these factors indicate that ballot questions are government speech. *See id.* (noting that a court's review will "almost always result in a finding that the speech is that of the government" where all three factors weigh in favor).

"The first factor—history—directs us to ask whether the type of speech under scrutiny has traditionally communicated messages on behalf of the government." *Id.*; *Mech v. Sch. Bd. of Palm Beach Cnty.*, 806 F.3d 1070, 1075–76 ("A medium that has long communicated government messages is more likely to be government speech"). This is easily met here. States have historically used questions,

referendums, or initiatives on the ballot to gauge public interest in proposals to enact or repeal laws or constitutional amendments. *See* Nan D. Hunter, *Varieties of Constitutional Experience: Democracy and the Marriage Equality Campaign*, 64 UCLA L. Rev. 1662, 1672–73; Nicholas Ansel, *Advancing Criminal Reform Through Ballot Initiatives*, 53 Ariz. St. L.J. 273, 276 (2021); Dina Conlin, Note, *Ballot Initiative in Massachusetts: The Fallacy of Direct Democracy*, 37 Suffolk U.L. Rev. 1087, 1090–94 (2004) (providing a backdrop of the adoption of ballot initiatives in the United States from its inception in South Dakota in 1898).

"The second factor—endorsement—asks whether 'observers reasonably believe the government has endorsed the message.'" *Leake*, 14 F.4th at 1248; *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*, 942 F.3d 1215, 1233 (11th Cir. 2019) (clarifying that the "question on the endorsement factor is whether the speech would be 'closely identified in the public mind with the government'"). Notably, the ballot questions are answered as citizens vote in an election—a government-organized (and funded) event that is central to our democracy. *See Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*, 942 F.3d 1215, 1233 (11th Cir. 2019) (noting that it is relevant whether the speech is "tied to [the] government spatially"); *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 823 (2015) (referring to voting by ballot as a "core aspect[ ]of the electoral process regulated by state constitutions"); *cf. Pleasant Grove City v. Summum*, 555

13

U.S. 460, 472 (2009) (concluding that monuments in public parks were identified with the government because "parks are often closely identified in the public mind with the government unit that owns the land").

And, while the Court recognizes that the underlying facts occurred during a Republican primary election, "[t]he fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message . . . ." *Walker*, 576 U.S. at 217. This is particularly true where "the government is organizing and funding the event through which the message is communicated." *Leake*, 14 F.4th at 1249–50. The fact that a reasonable observer could assume that the Republican Party endorsed the questions does not change the fact that observers would also assume that the Government has endorsed any question contained on the primary ballot. *See, e.g.*, *Geary v. Renne*, 914 F.2d 1249, 1252 (9th Cir. 1990) ("Although the government does not author [voters' pamphlets prepared and distributed by the government with a sample ballot], it has an interest in the messages that it assembles, publishes, and distributes and may therefore appear to approve."); *cf. Gundy v. City of Jacksonville*, 50 F.4th 60, 78–79 (2022) ("the City Council's invocation can be closely identified in the public mind with the government because the City Council organizes the invocation, it provides the venue for the invocation, it selects the speaker for the invocation, and then it begins its business meeting"); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576

U.S. 200, 212 (2015) (noting that observers would assume the government endorsed the designs on license plates because it bears the state name at the top and the state "issues the plates, regulates their disposal, and owns the designs"); *Leake*, 14 F.4th at 1249 (concluding that "[o]bservers would have reasonably believed the government endorsed" a parade's message because it advertised and promoted the parade while identifying itself as a co-host).

The third factor—control—"asks whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Leake*, 14 F.4th at 1248. "[C]omplete control is not required." *Cambridge Christian Sch.*, 942 F.3d at 1236. The Plaintiffs rightly point out that the statute granting the Republican Party the right to submit questions "to its members" provides that the "superintendent or Secretary of State *shall* have [the requested] language printed on the ballot form . . . ." O.C.G.A. § 21-2-284(d) (emphasis added). And, while such language does appear to give the Republican Party unfettered discretion regarding what is included in the questions, this provision should not be understood in a vacuum.

The Supreme Court has recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Anderson*, 460 U.S. at 796 (1983) ("There

can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election."). States have long outlawed attempts to influence voters within a polling place, and Georgia is no different. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 208–11 (1992) (upholding a state's prohibition of campaigning within 100 feet of a polling place). Georgia law clearly prohibits electioneering or soliciting votes within a polling place. O.C.G.A. § 21-2-414(a) ("[n]o person shall solicit votes in any manner or by any means or method, . . . [w]ithin any polling place"); O.C.G.A. § 21-2-413(d) ("[n]o person, when within the polling place, shall electioneer or solicit votes for any political party or body or candidate or question, nor shall any written or printed matter be posted within the room, except as required by this chapter").

There is no doubt that the Secretary of State correctly identified the Plaintiffs' proposed ballot questions as an attempt at influencing voters by strongly implying that the Candidates are "anti-Trump Democrats . . . ."[7] [Doc. 13 at 46; Doc. 13-5].

---

[7] As a reminder, the questions were proposed as follows:

1. Do you think anti-Trump Democrats should be able to get a court order to force the elections board to qualify them as Republican candidates for office?

2. Did you know that Steven Henry, Vanita Hullander, Jeff Long, and Larry Black were not approved to run as Republicans by the Republican Party?

[Doc. 13 at 46].

And, the Court sees no reason to believe that Georgia's long-standing prohibition on campaigning within a polling place would not apply to a political party's ballot questions. *Cf. Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 109 S. Ct. 1013, 1023, 103 L. Ed. 2d 271 (1989) ("The State may regulate the flow of information between political associations and their members when necessary to prevent fraud and corruption."); *Minn. Voters All. v. Mansky*, 585 U.S. 1, 15 (2018) ("Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation. It is a time for choosing, not campaigning. The State may reasonably decide that the interior of the polling place should reflect that distinction."); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997) ("Ballots serve primarily to elect candidates, not as fora for political expression."). So, the Court concludes that the control factor also weighs in the Defendants' favor and ultimately holds that the ballot questions were government speech.

Consequently, the Plaintiff's freedom of speech claim is **DISMISSED**.

### IV. Conclusion

The Defendants' Motion to Dismiss [Doc. 24] is **GRANTED**.

**IT IS SO ORDERED**, this 9th day of September, 2024.

_____
WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE