## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

CATOOSA COUNTY REPUBLICAN
PARTY and JOANNA HILDRETH,

            Plaintiffs,

v.

CATOOSA COUNTY BOARD OF
ELECTIONS AND VOTER
REGISTRATION, *et al.*,

            Defendants.

CIVIL ACTION FILE NO:

4:24-cv-00095

## <u>ORDER</u>

Before the Court is Defendants Catoosa County Board of Elections and Voter Registration, Marvin Cornelison, Nina Crawford, Tommy Davis, Ron McKelvy, and Tonya Moore's Second Motion to Dismiss for Failure to State a Claim. [Doc. 42]. After review, Defendant's Second Motion to Dismiss is **GRANTED** in part and **DENIED** in part.

## I.     BACKGROUND

### A. The Candidates

This dispute arose on March 4, 2024, when four individuals (Larry C. Black, Steven M. Henry, Jeffrey K. Long, and Vanita Hullander (collectively the "Candidates")), in Catoosa County, Georgia, attempted to qualify as Republican candidates on the 2024 Republican Primary Ballot (the "Ballot"). [Doc. 11 ¶ 12].

However, Plaintiff Catoosa County Republican Party (the "Party") refused to qualify the Candidates. [*Id*. ¶ 14].

On March 5, 2024, the Candidates filed suit in the Catoosa County Superior Court seeking injunctive relief against the Party. [*Id*. ¶ 19 n.4]; [Doc. 42-2 at 1].[1] The Candidates obtained a Temporary Restraining Order ("TRO") from Superior Court Judge Don Thompson. [*Id*.]. The TRO ordered the Party to qualify the Candidates for the primary. [Doc. 42-2 at 7].

However, the Party refused to comply with that Order. [Doc. 13-1]. Instead, the Party filed an Emergency Motion to Lift the TRO. [*Id*.]. On March 7, 2024, after a hearing, Judge Thompson denied that motion and ordered Catoosa County Sheriff deputies to escort the Candidates to the Party to be qualified. [*Id*. at 4]. Still, the Party did not comply.

On March 8, 2024, Judge Thompson held a compliance hearing. [Doc. 13-2]. After that hearing, "Defendant Tonya Moore, who works for the Catoosa County Board of Elections, acting under the color of law as the Elections Director for Catoosa County, executed paperwork listing the Candidates as being qualified as

---

[1]*See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (holding that "a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed."). The Superior Court Order is central to Plaintiffs' claims because Plaintiffs reference the Order in their Complaint [Doc. 11 ¶ 19 n.4], and they do not dispute its authenticity. Accordingly, the Court considers this attachment to Defendants' Motion to Dismiss in determining the present motion.

Republicans[.]" [Doc. 11 ¶ 19]. The Party appealed Judge Thompson's Order, but the Georgia Supreme Court subsequently dismissed the Party's appeal. *See Catoosa County Republican Party et al. v. Henry et al.*, S24A0917 (Ga. 2024); [Doc. 42-3].

Immediately after the entry of the March 8 Order, Plaintiff Hildreth (and other Catoosa County electors) filed a written challenge to the Candidates' qualifications pursuant to O.C.G.A. § 21-2-6(b). [*Id*. ¶ 22]. On April 2, 2024, the Board of Elections ("the Board") held a hearing on the elector challenges as required by O.C.G.A. § 21-2-6(c). [*Id*. ¶ 25]. The Board voted 4-1 that the Candidates were qualified to seek and hold the local offices for which they were running. [*Id*. ¶ 28]. Plaintiff Hildreth (and the other electors) appealed that decision to the Catoosa County Superior Court, but the Superior Court also dismissed that appeal. *See* [Doc. 42-4].

## B. The Ballot Questions

After Judge Thompson's March 8 Order, "the Party submitted primary ballot questions pursuant to O.C.G.A. § 21-2-284(d) for the general primary to Defendants, solely for use in Catoosa County, by certifying and submitting them to Defendant Moore by the deadline." [*Id*. ¶ 20]. The Ballot Questions read as follows:

1. Do you think anti-Trump Democrats should be able to get a court order to force the elections board to qualify them as Republican candidates for office?

2. Did you know that Steven Henry, Vanita Hullander, Jeff Long, and Larry Black were not approved to run as Republicans by the Republican Party?

[Doc. 11 at 46].

A week later, on March 15, 2024, Plaintiff Hildreth received communication from the Georgia Secretary of State's Office with concerns about the content of the Ballot Questions. [*Id*. ¶ 54]. The Secretary of State's Office explained that it "cannot publish party questions on the ballot that contain the names of candidates or commentary regarding those candidates, as that constitutes unlawful electioneering." [Doc. 42-5]. The Secretary of State gave Plaintiff Hildreth the option of submitting new ballot questions by March 18, 2024, but Hildreth did not do so. [*Id*.]. The Board did not include the Ballot Questions on the Ballot. [Doc. 11 ¶ 21].

### C. Procedural History

Plaintiffs filed their Complaint and a Motion for a TRO and Preliminary Injunction in this Court on April 5, 2024. [Docs. 1, 2]. Plaintiffs filed an Amended Complaint on April 9, 2024. [Doc. 11]. This Court held a hearing on the Plaintiff's Motion [Doc. 2] on April 17, 2024. [Doc. 20]. After the hearing, the Court denied Plaintiff's TRO because it found that an injunction would not serve the public interest given that absentee, overseas, and military ballots had already been sent and because the Plaintiffs failed to show a substantial likelihood of success on the merits. [Doc. 22].

Defendants filed their first Motion to Dismiss on May 3, 2024. [Doc. 24]. This Court granted Defendants' first Motion to Dismiss on September 9, 2024. [Doc. 27]. The Court dismissed the freedom of association claim for lack of standing and dismissed the freedom of speech claim as government speech, not protected private speech. [*Id.* at 11, 17].

Plaintiffs appealed that Order on September 11, 2024. [Doc. 29]. On June 12, 2025, the Eleventh Circuit vacated this Court's Order and remanded the matter. [Doc. 36]. The Eleventh Circuit held that Plaintiffs plausibly alleged a concrete injury to establish standing for the freedom of association claim's and plausibly alleged infringement of private speech. [*Id.* at 2–3]. Now, Defendants have filed a Second Motion to Dismiss [Doc. 42]. The Court held a hearing on that motion on October 6, 2025. [Doc. 45].

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and that rises above a speculative level. *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must have enough facts to plausibly allege the required elements of a cause of action. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). These facts, accepted as true at the pleading stage, must allow the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations and legal conclusions "masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (citation omitted); *see also Iqbal*, 556 U.S. at 678 (noting that "naked assertions devoid of further factual enhancement" are insufficient) (citation omitted). "[A] plaintiff armed with nothing more than conclusions" cannot "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678–79. Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citation omitted).

## III.    DISCUSSION

Plaintiffs allege that Defendants violated two of their First Amendment rights: (1) their right to freedom of association; and (2) their right to freedom of speech. [Doc. 11 at 12–19]. All claims are brought against Defendants in their individual and official capacities. [*Id.*]

Specifically, Plaintiffs allege that the Tommy Davis, Ron McKelvy, Nina Crawford, Marvin Cornelison, and Tonya Moore (the "Individual Defendants") acted unlawfully on three separate occasions. [*Id.*]. First, Plaintiffs contend that their First Amendment rights were violated on March 8, 2024, when Defendant Moore

executed Republican qualifying paperwork after the Superior Court of Catoosa County ordered that the Candidates be added to the Ballot. [*Id.* at 7–8].

Plaintiffs' second allegation stems from the fact that on April 2, 2024, the Board held a hearing and voted to qualify the Candidates for office. [*Id.* at 10]. Plaintiffs assert that this vote violated their First Amendment rights by forcing them to associate with the Candidates and by compelling their speech through the Candidates' presence on the Ballot. [*Id.* at 10–11, 15].

Finally, Plaintiffs allege that when the Board of Elections declined to allow the Ballot Questions on the Ballot, the Defendants restricted Plaintiff's speech based on its content and with the purpose of chilling future speech. [*Id.* at 17–19].[2]

---

[2]In their Motion to Dismiss, Defendants first argue that Plaintiff's Complaint is a "shotgun" pleading. [Doc. 42 at 6–7]. Federal Rule of Civil Procedure 8 requires that a complaint include "a short and plain statement of the claim showing that pleader is entitled to relief." Fed. R. Civ. P. 8. "Complaints that fail to meet the Rule 8 short-and-plain-statement standard 'are often disparagingly referred to as "shotgun pleadings".'" *Rodriguez v. Scott*, 775 F. App'x 599, 602 (11th Cir. 2019) (citing *Weiland v. Palm Beach Cnty. Sherriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015)). These kinds of pleadings can take several forms. *Id.* First, it "is a complaint that 'is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action.'" *Id.* (citing *Weiland*, 792 F.3d at 1322). Second, "is a pleading that asserts 'multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" *Id.* (citing *Weiland*, 792 F.3d at 1323). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland*, 792 F.3d at 1323. Here, Plaintiff's Complaint does not fall into either category of a shotgun pleading. Plaintiff's Complaint has given each Defendant adequate notice about the claims alleged and the claims' grounds. *See generally* [Doc. 11]. Additionally, even if the Court found that the Complaint was unclear on its face, the proper remedy would not be dismissal but rather would be to give Plaintiffs an opportunity to amend and provide clear explanations of the offense. Accordingly, Defendants' request for dismissal on this ground is denied.

## A. The Individual Defendants are Entitled to Qualified Immunity for Both Claims.

First, Plaintiffs bring both claims against the Individual Defendants in their individual capacities. [Doc. 11 at 2–4]. The Individual Defendants assert the defense of qualified immunity. [Doc. 42 at 14–25].

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Andre v. Clayton Cnty. Ga.*, 148 F.4th 1282, 1291 (11th Cir. 2025) (*quoting Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010)). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "To invoke the defense of qualified immunity, a government official must have been acting within the scope of his 'discretionary authority' when allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021) (quoting *Grider*, 618 F.3d at 1254 n.19). This requires that he was acting in accordance with his job-related duties, and within the scope of his authority. *Id.* "A government employee engages in a 'discretionary function' when she (1) performs 'a legitimate job-related function' (2) in an authorized

8

manner." *Valentine v. Robinson*, 601 F. App'x 778, 781 (11th Cir. 2015) (quoting *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004)).

Then, the burden shifts to the plaintiff to show the official's conduct violated a federal law that was clearly established at the relevant time. *Spencer*, 5 F.4th at 1230 (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998)). A plaintiff must establish "that the government officials (1) committed a constitutional violation; and (2) that this violation was 'clearly established' in law at the time of the alleged misconduct." *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023). Any failure of either qualified immunity prong bars the claim. *Id.* District courts have discretion to address any prong of the test first and may decide based on the particular circumstances of each case. *See Pearson*, 555 U.S. at 236; *Spencer*, 5 F.4th at 1230.

"[T]he Supreme Court has also 'repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation'." *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) (citations omitted). This is due to qualified immunity being "an i*mmunity from suit* rather than a mere defense to liability; and…it is effectively lost if a case is erroneously permitted to go" forward. *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526(1985)).

A plaintiff can show the law is clearly established in one of the three ways: "(1) 'show[ing] that a materially similar case has already been decided, whose facts

are similar enough to give the'" official notice; "(2) 'show[ing] that a broader, clearly established principle' derived from 'general statements of law contained within the Constitution, statute or caselaw' should 'control the novel facts of his case';" or "(3) showing that the officials "'conduct so obviously violates the [C]onstitution that prior case law is unnecessary.'" *Andre,*148 F.4th at 1298 (quoting *Edger*, 84 F.4th at 1235). Although the "law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7–8 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

### 1. March 8th Ballot Qualification (Freedom of Association)

Plaintiffs concede that Defendant Moore acted within her discretionary authority when she executed the paperwork that qualified the Candidates. [Doc. 11 at 7–8].[3] Therefore, to defeat qualified immunity, Plaintiffs must show that Moore's conduct violated a clearly established right at the time the alleged wrongful act was committed, and that conduct violated a constitutional right. *See Randall v. Scott*, 610 F.3d 701, 715 (11th Cir. 2010). After review, Plaintiffs have failed to show that it was clearly established that the Defendants' alleged conduct would be wrongful.

---

[3]Although Plaintiffs seem to assert this claim against all of the Individual Defendants, the Complaint only identifies Defendant Moore as the relevant actor in carrying out the Catoosa County Superior Court Order. [Doc. 11 at 8 n. 4]. In any event, because the Court grants qualified immunity, the claim would be dismissed as to all Individual Defendants even if Plaintiffs intended to assert it against each of them.

### a. Materially Similar Case

First, Plaintiffs fail to cite (and the Court cannot find) a materially similar case that would have given Moore, or any of the Individual Defendants, notice that it would be violating the Plaintiffs' constitutional rights to obey a court order and not qualify the Candidates.

### b. General Statements of Law

Second, Plaintiffs attempt to rely on general statements contained in case law to establish a clearly established right to freedom of association in primary elections. In support of this argument, Plaintiffs cites two cases: *Duke v. Massey*, 87 F.3d 1226 (11th Cir. 1996) and *California Democratic Party v. Jones*, 530 U.S. 567 (2000).

In *Duke*, David Duke sought the Republican Party nomination for President of the United States during the 1992 Election Cycle. *Duke*, 87 F.3d at 1228. Initially, "Duke's name appeared on the Georgia list of presidential candidates for the Republican Party nomination." *Id*. at 1229. However, later, the Georgia Republican Party Committee "deleted Duke's name from the list of potential republican presidential candidates." *Id.* Duke petitioned to have the Secretary of State place his name on the ballot. *Id*. "[T]he Committee held a meeting to reconsider its earlier decision to exclude Duke from the presidential primary preference ballot." *Id*. The Committee decided not to place Duke's name on the ballot. *Id*. Duke filed a lawsuit

alleging that Georgia's statute regulating presidential preference primary candidate selection violated his constitutional rights, including his freedom of association. *Id.*

The Eleventh Circuit held that "[t]he state has a compelling interest in protecting political parties' right to define their membership." *Id*. at 1234. The Court concluded that the statute was narrowly tailored to serve that end. *Id*. Notably, in that analysis, the Eleventh Circuit analyzed O.C.G.A. § 21-2-193. *Id*. That statute expressly provided that "each person designated by the Secretary of State as a presidential candidate shall appear upon the ballot of the appropriate political party or body unless all committee members of the same political party or body as the candidate agree to delete such candidate's name from the ballot." *Id*. at 1229 n.3. By enacting that statute, the Georgia General Assembly conferred authority to the state political parties to select its presidential candidates.

However, O.C.G.A. § 21-2-193 is not an issue in this case. The statutes at issue grant no such authority to county level party leaders. Instead, the plain language of both O.C.G.A. § 21-2-153 and O.C.G.A. § 21-2-154 mandate that parties qualify candidates who meet certain standards.

First, O.C.G.A. § 21-2-153(b) states:

Unless otherwise provided by law, all candidates for party nomination in a state or county primary shall qualify as such candidates in accordance with the procedural rules of their party; provided, however, that no person shall be prohibited from qualifying for such office if he or she:
1) Meets the requirements of such procedural rules;

12

2) is eligible to hold the office which he or she seeks;
3) is not prohibited from being nominated or elected by provisions of Code Section 21-2-7 or 21-2-8; and
4) if party rules so require, affirms his or her allegiance to his or her party by signing the following oath: "I do hereby swear or affirm my allegiance to the (name of the party) Party."

Those are objective criteria. Therefore, according to the statute, if a candidate fulfills each of those criteria, then they are qualified to be a candidate in accordance with the procedural rules of their party. The *Duke* Opinion shows that the General Assembly has the right to regulate the qualification of primary candidates, not that a local faction could prevent candidates that are otherwise qualified from being put on the ballot.

Next, O.C.G.A. § 21-2-154(a) states that "…the county executive committee of each political party shall certify to the superintendent and the state executive committee of each political party shall certify to the Secretary of State . . .". This statute requires that each party's qualification procedures be overseen by the Secretary of State. *Id*. However, this does not give leeway to local parties to make their own rules regarding candidate qualification.

Neither statute in this case gives subjective authority for local party officials to prevent local candidates from qualifying for a primary. And, the issues in front of the Court were not before the Eleventh Circuit in *Duke*.[4] Therefore, *Duke* is not a

---

[4] Specifically, *Duke* lacks any analysis of officials complying with a court order issued from a court of competent jurisdiction.

similar case to give Defendant Moore notice of it being "clearly established" that she should disobey the Superior Court and follow the political whims of local party officials.

Next, Plaintiffs rely on *California Democratic Party*, where a new California law "changed California's partisan primary from a closed primary to a blanket primary." *California Democratic Party*, 530 U.S. at 570. Under that system, all people may vote for any candidate, regardless of political affiliation. *Id*. Practically, this meant that "each voter's primary ballot now list[ed] every candidate regardless of party affiliation and allows the voter to choose freely among them." *Id*. Various political parties filed suit alleging "that California's blanket primary violated their First Amendment rights of association," because the system allowed non-party members to determine the party's candidate. *Id*. at 571.

The Supreme Court held it was a "clear and present danger" to have a party's nominee determined by an opposing party. *Id.* at 578. The Court reasoned that the danger of "[s]uch forced association has the likely outcome—indeed, in this case the *intended* outcome—of changing the parties' message." *Id*. at 581–82. The Court emphasized that it could "think of no heavier burden on a political party's associational freedom." *Id*. at 582.

Again, here, *California Democratic Party* does not provide notice to Moore that her actions were violating a clearly established law. The election in front of the

Court was not a blanket primary, but, was a partisan general primary. *See* [Doc. 11 at 6]. All names on the ballot identified with one party, namely the Republican party. [*Id.*]. The Candidates were not from a clearly opposing party. [*Id.*]. Plaintiffs fail to cite any evidence that the Candidates' inclusion was intended to change the Party's original message. Further, there is no evidence cited that their inclusion altered the party's message–except for the ballot questions that Plaintiffs themselves provided.

### c. So Obviously Violates the Constitution

Finally, at the hearing, Plaintiffs attempted to argue that Moore's conduct so obviously violated the Constitution that case law is unnecessary. However, the behavior in this case is a far cry from the type of conduct that fits within this type of notice for qualified immunity not to apply. *See, e.g., Hope v. Pelzer*, 536 U.S. 730, 733, 746 (2002) (finding that an officer was not entitled to qualified immunity when the guards "twice handcuffed [the petitioner] to a hitching post to sanction him for disruptive conduct" because the "obvious cruelty inherent in this practice" provided enough notice); *Lee v. Ferraro*, 284 F.3d 1188, 119867 (11th Cir. 2002) (finding that an officer was not entitled to qualified immunity because his conduct so obviously violated the constitution when he took the plaintiff "to the back of her car and slammed her head against the trunk *after* she was arrested, handcuffed, and completely secured"); *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005) (denying qualified immunity to an officer who intentionally shot a plaintiff in

the head); *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009) (denying qualified immunity where an officer repeatedly tasered a plaintiff "over a two-minute period without warning").

If anything, Moore was following a facially valid Georgia Superior Court Order. Officials should be able to rely upon court orders when performing their official duties. If they could not, officials would be unable to do their jobs in an efficient or practical manner and would be subject to being penalized for contempt. Therefore, Plaintiffs have failed to show it was "clearly established," that Moore's action would be illegal or subject her to liability. Accordingly, Defendants are entitled to qualified immunity in their individual capacities for the claim that they improperly included the Candidates' names on the Ballot on March 8, 2024.

## 2. April 2nd Board of Elections Vote (Freedom of Association)

Plaintiffs also concede that the Individual Defendants, in their roles on the Board, were acting within their discretionary authority when they voted to include the Candidates on the Ballot. [Doc. 11 at 7–8]. Therefore, to defeat qualified immunity, as previously discussed, Plaintiffs must show that the Individual Defendants' conduct violated a clearly established right at the time the alleged wrongful act was committed, and that conduct violated a constitutional right. *See*

*Randall*, 610 F.3d at 715. Plaintiffs have again failed to show any of the three methods by which they can establish a right is clearly established.

### a. Materially Similar Case

Again, Plaintiffs cite no materially similar case to give the Individual Defendants notice that voting to include the Candidates on the Ballot violated Plaintiffs' First Amendment right to freedom of association.

### b. General Statements of Law

To attempt to defeat qualified immunity, Plaintiffs argue that extensive case law shows the right to exclude was clearly established. *See* [Doc. 43 at 17–23] (citing *Democratic Party of U.S. v. Wis. ex rel. La Follette*, 450 U.S. 107 (1981); *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986); *Duke*, 87 F.3d at 1226; *Cal. Democratic Party*, 530 U.S. at 567). The Court has already addressed why *California Democratic Party* and *Duke* do not defeat qualified immunity to Moore's placement of the Candidates on the Ballot, and the same reasoning applies to this claim. However, Plaintiffs brings up three other cases to attempt to defeat qualified immunity in this context. The Court finds none create general statements of law such that the Individual Defendants would be on notice that their vote violated Plaintiffs' constitutional rights.

First, in *Democratic Party of the United States v. Wisconsin*, the Supreme Court considered whether "once Wisconsin has opened its Democratic Presidential preference primary to voters who do not publicly declare their party affiliation, it may then bind the National Party to honor the binding primary results, even though those results were reached in a manner contrary to National Party rules." *Democratic Party of U.S. v. Wis. ex rel. La Follette*, 450 U.S. 107, 120 (1981). The Court held that although Wisconsin had a compelling interest in preserving the integrity of its electoral process and could therefore conduct its elections at is chose, it could not "require that Wisconsin delegates to the National Party Convention vote there in accordance with the primary results, if to do so would violate Party rules." *Id*. at 126.[5]

Here, the local county election is conducted pursuant to state law, not national party rules. But, a partisan primary presumes that voters are affiliated with the political party under whose label the candidates seek nomination. Thus, this would be a local election conducted pursuant to state law where the party nominees are chosen by voters who identify as Republicans, unlike the situation in *Democratic Party of United States* where the party nominees could be chosen by voters with a different political affiliation. Accordingly, *Democratic Party of the United States*

---

[5] In *Democratic Party of the United States*, delegates to the National Party Convention were chosen by the party separate and apart from the Democratic Primary. *Id*. at 107.

does not support Plaintiffs' position. That decision addressed the conflict between state election procedures and national party rules governing convention delegates, not a local election conducted pursuant to state law.

Next, in *Eu v. San Francisco County. Democratic Cent. Comm.*, parties challenged sections of the California Elections Code banning primary endorsements and imposing restrictions on internal policy governance of political parties. *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 217 (1989). The Court found that the law preventing endorsements burdened the parties' First Amendment rights because the law hampered "the ability of a party to spread its message and hamstrings voters seeking to inform themselves about the candidates the campaign issues." *Id.* at 223.

Here, Plaintiffs challenge the Candidates placement on the Ballot. The Candidates were not seeking endorsement when they requested to be included on the Ballot. Primary endorsements are not at issue here and serve a different purpose than simply appearing on the Ballot.[6] When state law prohibits a party from endorsing, supporting, or opposing a candidate for nomination to a partisan office in a direct

---

[6] In opposing the Motion to Dismiss, Plaintiffs cited language from *Eu* in their response but do not quote the full sentence. Plaintiffs cited "While a State may regulate the flow of information between political associations and their members when necessary to prevent fraud and corruption…" [Doc. 43 at 18 n.15]. But, the full quote is "[w]hile a State may regulate the flow of information between political associations and their members when necessary to prevent fraud and corruption, there is no evidence that California's ban on party primary endorsements serves that purpose." *Eu*, 489 U.S. at 228–29 (internal citations omitted). Fraud and corruption are not at issue in this case.

primary election, it may burden freedom of speech and infringe on freedom of association. However, those are not the facts before the Court. While state law mandated that the Candidates would be on the Ballot, it did not prohibit the local party from opposing the Candidates' election or require the party to endorse or support them. Therefore, *Eu* also does not help Plaintiffs defeat qualified immunity.

Finally, Plaintiffs cite a Connecticut case which considered whether the state Republican party could adopt a party rule permitting independent voters to vote in Republican primaries for federal and state-wide officials. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 211–12 (1986). There, the Supreme Court held that the plaintiff's freedom of association was burdened by allowing non-registered party affiliates to vote for primary candidates. *Id*. at 225. Here, Plaintiffs do not challenge independent voters. Plaintiffs challenged the Candidates' inclusion on the Ballot due to the local party's rules.

Therefore, Plaintiff has cited no case which provides general statements of law such that qualified immunity is defeated for the Individual Defendants based on the allegations of their alleged wrongful actions.

### c.  So Obviously Violates the Constitution

Moreover, like with their other freedom of association claim, Plaintiffs have failed to show that the 4-1 vote "so obviously" violated the constitution. Therefore, Plaintiffs have failed to demonstrate the "clearly established" prong, and the

Defendants are entitled to qualified immunity for the vote on April 2, 2024, to allow the Candidates on the Ballot.

### 3.  Omitted Ballot Questions (Freedom of Speech)

Plaintiffs allege that by not adding their proposed Ballot Questions (which included the Candidates' names and referenced current events), the Individual Defendants restricted their freedom of speech based on the content of the speech. [Doc. 11 at 18]. The Individual Defendants are entitled to qualified immunity for this claim as well.

### a.  Materially Similar

First, Plaintiffs fail to cite a similar case that would give Defendants notice that their decision would violate a clearly established constitutional right.

### b.  General Statements of Law

Second, Plaintiffs fail to present case law of a broader, clearly established principle from general statements of law to give Defendants notice. Plaintiffs' Response to the Motion to Dismiss cites to *Eu* for the general guideline the state government should not involve itself in internal party operations. [Doc. 43 at 16] (citing *Eu*, 489 U.S. at 228). However, as laid out above, *Eu* concerned a California state law which did not allow official governing bodies to "endorse, support, or oppose" candidates "for nomination by that party for partisan office in direct primary election." *Id*. at 217. Additionally, a separate California law regulated internal party

affairs like size and composition of state central committee, how chair rotation should occur, and the specific time and place for committee meetings among other details. *Id.* at 218. The Supreme Court held that banning primary endorsements violated the First and Fourteenth Amendment and did not uphold the internal restrictions on governing bodies' organization and composition. *Id.* at 214–15. The Court also determined that the restrictions on composition of parties were also unconstitutional. *Id.* at 215.

However, *Eu* does not put Defendants on notice regarding the alleged wrongful actions in this case. The refusal to put the Ballot Questions on the Ballot does not prohibit the Catoosa Republican Party from endorsing candidates in more traditional means. As well, the Republican Party rules allow for endorsement, but do not allow for the endorsement by the committee member in their official title. [Doc. 11 at 30].[7] Additionally, all the events Plaintiffs take issue with happened before the election, rather than during the election itself as in *Eu*. The other elements of the case are not applicable, as Defendants have not told the Republican Party where it can hold meetings or regulate its internal composition. Therefore, *Eu* would not give notice to Defendants that their conduct violated Plaintiffs' constitutional rights.

---

[7] The pertinent section reads: "County Committee members shall not use their official title in any manner in connection with their support of any candidate for any public office in the State of Georgia in either a special election or for the Republican nomination in a primary where there is at least one other announced Republican candidate." [Doc. 11 at 30].

### c. So Obviously Violates the Constitution

Finally, Plaintiffs once again fail to show Defendants' conduct so obviously violated the Constitution. Plaintiffs have not met the "clearly established" prong. Accordingly, Defendants are entitled to qualified immunity as to Plaintiffs' individual free speech claims.[8]

**B. Under *Monell* liability, Plaintiffs fail to state a claim for freedom of association, but not for freedom of speech against the Board and the Individual Defendants in their official capacity.**

Plaintiffs allege that Defendants are subject to municipal liability under *Monell* liability for violations of their First Amendment rights to freedom of speech and association. [Doc. 11 7–8, 11; Doc. 43 at 7].[9]

To subject a municipality to liability pursuant to § 1983, plaintiffs must meet the requirements set out in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). These include: "(1) that [their] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."

---

[8] Since Defendants are entitled to qualified immunity, the Court need not determine whether absolute immunity is appropriate.

[9] Because Plaintiffs sue the Individual Defendants in their official capacity as well, the Court addresses both their liability and the Board's liability under *Monell*. *See Brandon v. Holt*, 469 U.S. 464, 472 (1985) ("For the purpose of evaluating the city's potential liability under [section] 1983, our opinion clearly equated the actions of [an officer] in his official capacity with the actions of the city itself."). In this section, for ease of reference, the Court refers to both the Board and the Individual Defendants as "Defendants."

*Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir 2021) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

"A plaintiff can establish municipal liability under *Monell* in three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 48 F.4th 1222, 1229 (11th Cir. 2022). In fact, a single decision by an official policymaker can establish a municipal's unconstitutional policy. *See Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992). The Eleventh Circuit has set forth guiding principles to evaluate whether the decision of a single official is sufficient to give rise to municipal liability among them:

> (1) Municipalities have section 1983 liability only for acts officially sanctioned or ordered by the municipality. (2) Only those municipal officials who have final policymaking authority may subject the municipality to section 1983 liability for their actions. (3) The determination of whether or not a particular official has final policymaking authority is governed by state law, including valid local ordinances and regulations. (4) The challenged action must have been taken pursuant to a policy adopted by the official or officials responsible for making policy in that particular area of the city's business, as determined by state law.

*Chabad*, 48 F.4th at 1229 (internal citations and quotation marks omitted). The Eleventh Circuit has also "consistently recognized and given effect to the principle

that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Id.* at 1230 (quoting *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997)).

### 1.  March 8th Addition to the Ballot (Freedom of Association)

Plaintiffs argue that Defendant Moore executed paperwork qualifying the Candidates as Republicans, which allegedly violated Plaintiffs' First Amendment right not to associate. [Doc. 11 at 8 n.4, 12–16]. Plaintiffs contend that Moore acted with final decision-making authority and that her actions therefore constitute a municipal policy. [*Id.* at 13–15].

This argument fails because Moore acted pursuant to a court order when she placed the Candidates on the ballot, and Georgia law requires compliance with facially valid court orders. *See* O.C.G.A. § 15-1-4(a)(3).[10] Disobedience of such an order could subject an official to contempt. *See In re Pruitt*, 249 Ga. 190, 210 (1982) (stating trial courts have the power to punish for contempt "is an inherent power of superior courts in Georgia"); *Jarallah v. Simmons*, No. 1:04-cv-3636-JEC, 2006 WL 8431953, at *5 (N.D. Ga. Jan. 12, 2006) (stating the Georgia Constitution grants all

---

[10] That statute reads as follows: "[t]he powers of the several courts to issue attachments and inflict summary punishment for contempt of court shall extend only to cases of…[d]isobedience or resistance by any officer of the courts, party, juror, witness or other person or persons to any lawful writ, process, order, rule, decree or command of the courts[.]" O.C.G.A. § 15-1-4(a)(3).

Georgia courts the power to punish contempt pursuant to O.C.G.A. § 15-1-4(a)(3)) *aff'd*, 191 F. App'x 918 (11th Cir. 2006).  Because Moore's actions were taken pursuant to a facially valid court order, she did not possess final policymaking authority in this context.

Further, Moore's actions were subject to *meaningful administrative review* because the Board held a hearing, pursuant to O.C.G.A. § 21-2-6, on the elector challenges that Plaintiff Hildreth (and other Catoosa County electors) filed. [Doc. 11 ¶ 22–28]. That hearing constituted meaningful administrative review. *See Scala v. City of Winter Park*, 116 F.3d 1396, 1402–03 (11th Cir. 1997) (reasoning that a city manager and public safety director were not final policymakers with respect to employment termination decisions because the Civil Service Board had the authority to review such decisions); *Denno v. Sch. Bd. of Volusia Cnty., Fla.*, 218 F.3d 1267, 1277 (11th Cir. 2000) (reasoning that school officials were not final policymakers when school grievance procedures allowed for meaningful review decisions).

Accordingly, Plaintiffs fail to plausibly allege that Moore's conduct constituted official municipal policy. Without final policymaking authority, there can be no *Monell* liability based on her actions. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004) (citing cases for the proposition that "[t]o determine if someone is a final policy maker, we look not only to 'state and local positive law,' but also 'custom and usage having the force of law.'") (quoting

*McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996)); *see also Davis v. City of Apopka,* 734 F. App'x 616, 620 (11th Cir. 2018) (relying on state law to determine whether an official had final policymaking authority).

### 2. April 2nd Inclusion on the Ballot (Freedom of Association)

Next, Plaintiffs allege that when the Defendants voted to include the Candidates on the Ballot, the Defendants violated Plaintiffs' First Amendment right of freedom of association. In support, Plaintiffs cite O.C.G.A. § 21-2-6 and contend that the Defendants acted with properly vested final decision-making authority regarding candidate qualification and ballot inclusion. [Doc. 11 at 9–11].

Plaintiffs are correct that ballot inclusion is an authorized statutory function of the Board. *See* O.C.G.A. § 21-2-6(c). The statute gives broad latitude to the "superintendent" (here, the Board) to "determine if the candidate is qualified to seek and hold the public office for which such candidate is offering[,]" "withhold the name of candidate form the ballot or strike such candidate's name from the ballot if the ballots have been printed[,]" and place "prominent notice[s]" at polling places. *Id*. Therefore, according to the statute, the Board seemingly has final decision-making power when it comes to placing candidate names on ballots.[11]

---

[11] Similar to Moore's action on the inclusion of the Candidates' names on March 8th, arguably, the Board's vote on April 2nd, may have also been pursuant to the Superior Court Order. If that is true, then one might surmise that the Board was not the final decision maker when it took the April vote, since the Superior Court might have also held it in contempt. The Court does not foreclose that possibility and will revisit that issue upon dispositive motions in this case.

In their Motion to Dismiss, Defendants point to O.C.G.A. § 21-2-6(e) to suggest that there is a mechanism for review of a superintendent's (the Board's) decision such that the Board did not have final decision-making authority. [Doc. 42-1 at 13]. The statute grants aggrieved parties the right to obtain a review of final judgment of a superior court. *See* O.C.G.A. § 21-2-6(e) (stating that the "…right to appeal the decision of the superintendent by filing a petition in the superior court of the county in which the candidate resides within ten days after the entry of the final decision by the superintendent."). Upon review, the superior court has authority to reverse or modify the decision if it finds, among other things, "violation[s] of the Constitution or laws of this state;" "excess of statutory authority of the superintendent;" "…unlawful procedures;" or "clearly unwarranted exercise of discretion." *Id*. at § 21-2-6(e)(1)–(6).

However, the relevant inquiry into whether an official has *Monell* final decision-making authority is whether their decisions are subject to *meaningful administrative review. See Scala*, 116 F.3d at 1401 (holding that a city manager was not a final policymaker because his decision was subject to "meaningful administrative review."). Meaningful administrative review is not the same as judicial review. *See Willingham v. City of Valparaiso, Fla.*, 97 F. Supp. 3d 1345, 1355 (N.D. Fla. 2015) ("Judicial review simply does not constitute administrative review. Had the Eleventh Circuit intended judicial review to suffice, it would have

said so."), *aff'd*, 638 F. App'x 903 (11th Cir. 2016). If that was the case, municipalities would be shielded "from liability for the actions of its final policymakers" because such reasoning would allow "courts [to] serve as the backstop to all delegation of authority." *Id*. at 1356. Judiciaries and judicial review function independent from municipalities. *Id*. Therefore, "a court order is not a municipality's own 'review' of the authority it has delegated." *Id*.

Therefore, O.C.G.A. § 21-2-6's framework demonstrates that the Board's vote regarding the ballot was not subject to meaningful *administrative review*. Because that decision was not reviewable or reversible by an administrative body, the Board possesses unreviewable final policymaking authority in this area. Therefore, Plaintiff's First Amendment freedom of association claim against Defendants for the April 2nd vote proceeds past this Motion to Dismiss.

### 3. Omitted Ballot Questions (Freedom of Speech)

Finally, Plaintiffs allege that Defendants' refusal to add Plaintiffs' Ballot Questions violate their First Amendment right to freedom of speech. [Doc. 11 at 16]. The Court finds that Plaintiffs have alleged enough in their complaint for this claim to proceed past this Motion to Dismiss.

Under O.C.G.A. § 21-2-284(d), in submitting ballot questions which are "to be voted on by one county only[,]" the "party shall . . . certify the wording of said questions to the superintendent." Here, the Ballot Questions were only to be voted

on by one county, Catoosa County. Thus, the superintendent, here the Board, was the appropriate party to certify the ballot questions.

Next, O.C.G.A. § 21-2-284(d) dictates that the superintendent, and no other alternative official, "shall have such language printed on the ballot form[.]" Therefore, the Board had final decision-making authority to decide whether to print the Ballot Questions. This statutory scheme fits within the third method to establish *Monell* liability: identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights. *See Chabad Chayil, Inc.*, 48 F.4th at 1229. Thus, Defendants were the appropriate body with final decision-making authority.

Lastly, to survive this Motion to Dismiss, the challenged action must have been done pursuant to a policy adopted by the officials responsible for making policy in a particular area of municipality's business. This is determined by state law. *See Holloman ex rel. Holloman*, 370 F.3d at 1292 (citing cases for the proposition that "[t]o determine if someone is a final policy maker, we look not only to 'state and local positive law,' but also 'custom and usage having the force of law.'") (quoting *McMillian*, 88 F.3d at 1577); *see also Davis,* 734 F. App'x at 620 (relying on state law to determine whether an official had final policymaking authority).

The authority to omit ballot questions solely belonged to the Board. *See* O.C.G.A. § 21-2-284(d). While the Georgia's Secretary of State Office raised

concerns, the statute gives power to the Board to decide whether to publish the questions or not. Therefore, after consideration, Plaintiffs' claim against the Board and the Individual Defendants in their official capacity for violation of Plaintiffs' First Amendment right to freedom of speech survives this Motion to Dismiss.[12]

## IV.   CONCLUSION

Accordingly, Defendant's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**. All claims asserted against the Individual Defendants (Marvin Cornelison, Nina Crawford, Tommy Davis, Ron McKelvy, and Tonya Moore) in their individual capacities are **DISMISSED**. Plaintiffs' First Amendment freedom of association claim against all Defendants for the March 8th Ballot Inclusion is also **DISMISSED**. The only remaining claims are the Plaintiffs' First Amendment freedom of association for the Board's April 2nd vote and the freedom of speech claim against the Board of Elections and the Individual Defendants in their official capacities, in addition to the Plaintiff's petition for an injunction to prevent future violation of their First Amendment claims as alleged.

**IT IS SO ORDERED**, this 25th day of February, 2026.



WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

---

[12] Allowing the official capacity freedom of speech claim to survive is consistent with the Eleventh Circuit's remand opinion.